UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TERESA E. KELLY,                         Case No. 1:15-cv-119
        Plaintiff,                       Barrett, J.
                                         Litkovitz, M.J.
    vs.

COMMISSIONER OF                          **REPORT AND**
SOCIAL SECURITY,                         **RECOMMENDATION**
        Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB).  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 11) and the Commissioner's response in opposition (Doc. 16).

**I.  Procedural Background**

Plaintiff protectively filed an application for DIB in February of 2012, alleging disability

since December 8, 2005, due to a traumatic brain injury, chronic fatigue syndrome, long term

insomnia, bulging disks and neck and back injury, uncontrolled hypertension, Raynaud's

phenomenon, mitral valve prolapse/enlarged heart, hypothyroidism, hearing loss in the right ear,

and headaches.  (Tr. 175).  Plaintiff subsequently amended her alleged disability onset date to

December 1, 2010.  Plaintiff's application was denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative

law judge (ALJ) Robert W. Flynn.  Plaintiff and a vocational expert (VE) appeared and testified

at the ALJ hearing.  On January 16, 2014, the ALJ issued a decision denying plaintiff's DIB

application.  (Tr. 13-25).  Plaintiff's request for review by the Appeals Council was denied,

making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] last met the insured status requirements of the Social Security Act on December 31, 2010.

2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of December 1, 2010, through her date last insured of December 31, 2010 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the [plaintiff] had the following severe impairments: status post remote traumatic brain injury, migraines, degenerative disc disease of the lumbar and cervical spines, insomnia, polyarthralgias, and Raynaud's phenomenon (20 CFR 404.1520(c)).

4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), and more particularly, she was limited to lifting up to 20 pounds, frequently lifting or carrying 10 pounds, standing/walking for 6 hours in an 8-hour workday, and sitting for 6 hours in an 8-hour workday. In addition, she was limited to pushing/pulling within those weight restrictions, occasional use of foot controls, never climbing ladders, ropes or scaffolds, and occasional climbing ramps or stairs. The [plaintiff] was also limited to occasional balancing, stooping, crouching, kneeling, and crawling. Further, the [plaintiff] was limited to occupations that did not involve exposure to more than a moderate level of noise (business office, department store, light traffic), and did not involve exposure to hazards, such as unprotected heights, the use of moving machinery or commercial driving. Moreover, the [plaintiff] was

3

limited to work that involved simple, routine, repetitive tasks; performed in a low
stress environment, defined as free of fast paced production requirements,
involved only simple work-related decisions, few - if any – work place changes,
and only occasional interaction with the general public and coworkers.

6.  Through the date last insured, the [plaintiff] was unable to perform any of her
past relevant work[1] (20 CFR 416.965).

7.  The [plaintiff] was born [in] 1957 and was 53 years old, which is defined as an
individual closely approaching advanced age, on the date last insured (20 CFR
404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate
in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability
because using the Medical-Vocational Rules as a framework supports a finding
that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable
job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff]'s age, education,
work experience, and residual functional capacity, there were jobs that existed in
significant numbers in the national economy that the [plaintiff] could have
performed (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] was not under a disability, as defined in the Social Security
Act, at any time from December 1, 2010, the alleged onset date, through
December 31, 2010, the date last insured (20 CFR 404.1520(g)).

(Tr. 15-25).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1] Plaintiff's past relevant work was as a technical writer and medical laboratory technician, both of which were skilled positions. (Tr. 23).

[2] The ALJ relied on the VE's testimony to find that plaintiff could perform the requirements of representative light unskilled occupations such as mail clerk (100 jobs regionally and 60,000 jobs nationally), routing clerk (7,500 jobs regionally and 400,000 jobs nationally), and electrode cleaner (250 jobs regionally and 40,000 jobs nationally). (Tr. 24).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff alleges two assignments of error: (1) the ALJ erred by mischaracterizing the opinion of examining neuropsychologist Dr. Chad Vickery, Ph.D., and by giving the opinion "great weight"; and (2) the ALJ erred in weighing the opinions of her treating physicians. (Doc. 11). Because both assignments of error go the ALJ's weighing of the medical

opinion evidence, the Court will consider both assignments of error together as a single assignment of error.

### 1. The governing law

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must determine the weight the opinion should be given based on a number of factors, including the length, nature and extent of the treatment relationship and the frequency of examination, as well as the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the

opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on [the SSA's] decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937; 20 C.F.R. § 404.1527(c)(2). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p).

In contrast to treating physician opinions, nontreating and nonexamining source opinions are never assessed for "controlling weight." A nontreating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson*, 378 F.3d at 544. The opinion of a nontreating but examining source is generally entitled to more weight than the opinion of a nonexamining source. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010); 20 C.F.R. § 404.1527(c)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

### 2. The medical opinion evidence

In formulating plaintiff's RFC, the ALJ considered numerous opinions issued over the course of more than a decade by plaintiff's treating physicians, Dr. Ramon Malaya, M.D.; Dr. Taya Thayapran, M.D.; Dr. Hazem Kakaji, M.D.; Dr. Prasad, M.D.; and Dr. David Provaznik, D.O. (Tr. 19-23). Plaintiff sought treatment from each of these physicians following a work-

related accident in 1997 when plaintiff fell off of a chair, hit the side of her face on a desk, fell to the floor, and had a bicycle fall on her. (Tr. 409). Plaintiff filed a workers compensation claim in connection with the accident.

Dr. Malaya wrote several letters reporting on plaintiff's medical condition in connection with her workers compensation claim. In letters dated January and February 2000, Dr. Malaya wrote that as a result of the work-related injury plaintiff suffered on February 10, 1997, she had considerable pain and discomfort in her lower back and neck, tingling in her right arm, weakness in her right leg, and a stiff neck with headaches. (Tr. 295, 298). Dr. Malaya reported that plaintiff's headaches were caused by a cervical strain with disc bulging and muscle spasms which were a direct result of the injury and that the medication Maxalt relieved her headaches. He also reported that plaintiff had trouble sleeping as a result of her symptoms but that Ambien gave her relief. In a subsequent letter dated February 29, 2000, Dr. Malaya reported that plaintiff had constant stiffness in her neck and back and tingling in her arms. (Tr. 296). In March 2000, Dr. Malaya wrote that since her February 1997 work-related injury, plaintiff suffered headaches, neck knots, spasms and stiffness, pain radiating down her arms, low back pain with muscle spasms, stabbing pain in her hips, and numbness in her legs down to her toes. (Tr. 297). Dr. Malaya wrote that March 1998 MRIs disclosed abnormal findings of disc bulging of the cervical spine at C5-C6 and of the lumbar spine at L5-S1, which he opined was a direct result of plaintiff's 1997 work-related injury. In May 2002, Dr. Malaya provided an update on the medications he prescribed for plaintiff. (Tr. 293-94). He reported that as a result of the 1997 workplace accident, plaintiff sustained a neck and lumbar area sprain; right eye contusion; strains of the right shoulder, wrist, elbow, thumb and knee; some hearing loss in the right ear; and headaches. Plaintiff regularly took Motrin 600 mg but her pain was intermittent; she sometimes

8

took Darvon and Flexeril to control neck and low back pain and muscle spasms; and Maxalt continued to relieve her headaches. She was presently working as a lab technician, which required bending, lifting, shaking, and constant standing, and she was in extreme pain performing this job. She sometimes would "blackout" when she turned her head a certain way. Dr. Malaya wrote that a 30-day supply of Darvon was insufficient and that plaintiff sometimes required Ambien. In June 2002, Dr. Malaya completed a form listing plaintiff's diagnoses as migraine headaches, cervical lumbar strain/sprain, bulging discs, and shingles. (Tr. 229). He wrote that her condition commenced on the date of her work injury and was expected to last her lifetime. He indicated that plaintiff had been unable to work since May 24, 2002. Finally, Dr. Malaya wrote an undated letter which states in full:

> Due to the exacerbation of her injuries of her cervical spine, lumbar spine, bulging discs, and migraine headaches, I have advised her to [do] no bending or lifting over 10 pounds, and no prolonged standing.

(Tr. 291).

Dr. Thayapran completed two forms dated July 25, 2005. (Tr. 281, 282). One form is a copy of Dr. Malaya's June 6, 2002 questionnaire (Tr. 229) with Dr. Thayapran's stamp, signature, and signature date substituted in place of Dr. Malaya's. (Tr. 282). On the other form, Dr. Thayapran listed Chronic Fatigue Syndrome as the sole diagnosis. (Tr. 281). He indicated that the condition lasted from August 11 to 28, 2004, plaintiff was unable to work during that time period as a result of the condition, and the likely duration of the condition and frequency of episodes of incapacity was "lifetime." (*Id*.). Dr. Thayapran also wrote a letter dated April 10, 2006, which is identical to Dr. Malaya's undated letter. (Tr. 312).

Dr. Kakaji wrote three letters dated January 2008, July 2008 and January 2009, each of which is identical to Dr. Malaya's undated letter. (Tr. 284, 290, 289). Dr. Prasad wrote an identical letter dated July 30, 2009. (Tr. 288).

Dr. Provaznik wrote a letter dated May 2010 to an attorney regarding plaintiff's workers compensation claim. (Tr. 256). Dr. Provaznik stated that plaintiff was "allowed sprains and contusions to multiple body sites along with a head injury" as a result of her 1997 work injury and she "continue[d] to suffer with these complaints." (*Id.*). Dr. Provaznik added:

> The description of her accident describes a traumatic brain injury with at least a Grade II concussion with longterm insomnia and headaches resulting. I feel this should be recognized and her therapy continued with her Ambien and Maxalt to help control the insomnia and headaches.
>
> In addition she suffered multiple soft tissue contusions and rotational injuries to her cervical/lumbar spine. These have not healed with time and I suspect a deeper nexus of injury with possible muscle tears as opposed to the strain and sprain pattern. These problems continue to flare up on her requiring occasional use of Darvocet and Flexeril which I feel should be continued for the patient to maintain a work history. At times she may require physical therapy and I feel her claim should be held open and allowed as necessary for review.

(*Id.*).

In September 2010, Dr. Provaznik wrote a letter that reads in its entirety:

> Due to the exacerbation of her injuries of her cervical spine, lumbar spine, bulging discs, and migraine headaches, I have advised her to limit working day shift only, working no longer than 8 hours per day and no working more than 40 hours per week, no shift rotating, no weekend, or call in duty, and no lifting over 10 pounds.

(Tr. 244).

Subsequently, Dr. Provaznik completed a Physical Capacities Assessment dated January 13, 2013. (Tr. 388-90). He assessed plaintiff as able to lift 10 pounds occasionally because of "functional limitations due to her medical history," which consisted of diagnoses of chronic fatigue syndrome, traumatic brain injury with memory loss and insomnia, hypertension, chronic

10

headaches, polyarthralgias with Raynaud's phenomenon, and chronic pain of the neck and thoracic and lumbar spines. (Tr. 388). He assessed plaintiff as able to stand/walk a total of 2 hours in an 8-hour day and for 30 minutes without interruption due to chronic pain in her neck and back and to sit for 4 hours total and 30 minutes without interruption due to polyarthralgias and chronic pain of the neck and thoracic and lumbar spines. (Tr. 389). He opined that plaintiff could never climb and could occasionally kneel, crouch, stoop, balance and crawl due to her chronic neck and back pain. He opined that she could reach and push/pull occasionally due to chronic neck and back pain; handling/feeling were impacted by polyarthralgias with Raynaud's phenomenon; and she had a history of memory/speaking problems secondary to traumatic brain injury. Dr. Provaznik also assessed environmental restrictions against heights, vibrations and moving equipment based on plaintiff's diagnoses and pain symptoms. (Tr. 390). Dr. Provaznik opined that plaintiff's disability had existed since prior to December 2010 and would be expected to continue for the next 12 months.

Finally, Dr. Provaznik wrote in a letter dated April 2013 that plaintiff, who had a long-standing workers compensation claim for a head injury with associated effects, had informed him that the Bureau of Workers Compensation told her "there are no long-term sequelae associated with head injuries." (Tr. 417). Dr. Provaznik wrote that he had advised plaintiff that there are long-term minor and severe sequelae associated with head injuries as shown by multiple studies. (*Id.*). Dr. Provaznik did not include any type of diagnosis in his letter or state that he had informed plaintiff that she was suffering long-terms effects from her 1997 injury.

The ALJ gave each of the treating physician's opinions "little weight." (Tr. 19-22). The ALJ gave several reasons for his assessment. The ALJ found that the opinions were "conclusory in nature"; not well-supported by medically accepted clinical findings and laboratory diagnostic

techniques; inconsistent with other substantial evidence in the case record; and based heavily on plaintiff's self-reports of subjective complaints, which the ALJ found were not fully credible. (Tr. 19-22). The ALJ also found that several of the opinions were too remote in time from the alleged period of disability to be relevant to plaintiff's claim.

Plaintiff alleges that the ALJ's reasons for rejecting the assessments of her treating physicians are not substantially supported. (Doc. 11 at 10-13). Plaintiff alleges that the ALJ applied the treating physician rule set forth in 20 C.F.R. § 404.1527 but failed to provide sufficiently specific reasoning or any citations to the record in support of his decision to afford the treating physicians' opinions "little weight." Plaintiff asserts that the ALJ did not set forth his rationale for finding all five treating physicians relied on self-reported subjective complaints that were not credible, and he did not consider that the treating physicians' reports were consistent. In addition, plaintiff alleges that the ALJ was not consistent in assigning weight to the various medical assessments based on the date they were issued.

The record demonstrates that the ALJ reasonably discounted the opinions of plaintiff's treating physicians. The ALJ gave "good reasons" for giving "little weight" to the treating physicians' opinions and those reasons are substantially supported by the record.

First, the ALJ reasonably discounted the treating physicians' opinions on the ground they were not well-supported by clinical findings and laboratory diagnostic techniques. The ALJ thoroughly reviewed the findings and assessments of the treating physicians and discussed the medical signs and findings that were inconsistent with their assessments, including imaging studies, physical examination findings, and laboratory test results. The ALJ noted that in August 2009, a physician who reviewed MRIs of plaintiff's lumber spine, cervical spine, and head performed in 2002 and 2003 reported they were all normal. (Tr. 18, citing Tr. 261-63). Further,

after plaintiff presented to a physician with left knee pain in November 2010, she was found to be "neurovascularly intact" on physical examination and her x-rays were largely normal. (Tr. 22, citing Tr. 380). In December 2010, Dr. Provaznik reported that plaintiff was "relatively normal" neurologically. (*Id*., citing Tr. 352, 371). In December 2010, a physician reported that although plaintiff displayed symptoms of polyarthralgias with Raynaud's phenomenon, which excluded classical arthritis, results of a rheumatoid arthritis test performed that month were negative. (*Id*., citing Tr. 287, 314). In addition to these objective findings, the ALJ reasonably considered the contrary medical evidence provided by Dr. Vickery, a neuropsychologist who evaluated plaintiff at the request of treating physician Dr. Provaznik and opined that the sequelae of her 1997 injuries may have been mild and were not problematic "until life stressors reached a recent fever pitch." (*Id*., citing Tr. 408-11). The ALJ reasonably concluded based on these findings that the medical records failed to reflect objective clinical or laboratory findings that supported the significant limitations imposed by plaintiff's treating physicians. (Tr. 23).

Plaintiff has not identified clinical findings and laboratory diagnostic techniques which, contrary to those cited by the ALJ, provide substantial support for the assessments of plaintiff's treating physicians. The lack of supporting objective findings constitutes a "good reason" under the law for discounting the treating physicians' opinions. *Walters,* 127 F.3d at 530 (a treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and must not be "inconsistent with the other substantial evidence" in the record before it is entitled to controlling weight); 20 C.F.R. § 404.1527(c)(2)).

Second, the ALJ reasonably discounted the treating physicians' opinions on the ground the opinions were based heavily on plaintiff's self-reports of subjective complaints, which the ALJ found were not fully credible for reasons he thoroughly discussed in his opinion. The ALJ

13

determined that plaintiff's complaints of pain and limitations were inconsistent with the evidence

of record, including normal imaging studies (Tr. 18, citing Tr. 261-63); significant gaps in

plaintiff's treatment, including a one-year period from November 2010 to November 2011 when

she did not see her treating physician Dr. Provaznik (*Id.*, citing Tr. 336); a notation in Dr.

Provaznik's records that plaintiff may have made misrepresentations on examination by an

independent examiner (Tr. 19, citing Tr. 353); and inconsistencies between plaintiff's allegations

concerning her activities of daily living and her actual activities (Tr. 18-19). The ALJ

specifically relied on the treatment note dated January 20, 2012, related to plaintiff's complaint

of pain in her right elbow of four months' duration, which stated: "Four months ago she was

doing a lot of woodworking on her deck - a lot of staining. Since then she has been doing a lot

of work as well on her home - remodeling her home." (Tr. 378). The ALJ reasonably relied on

plaintiff's self-reports of daily activities to find she was functioning at a much higher level than

found by her treating physicians. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th

Cir. 2004) (permitting an ALJ to consider daily activities in evaluating complaints of disabling

pain). *See also* 20 C.F.R. § 404.1529(c)(3)(i) (authorizing an ALJ to consider daily activities

when evaluating pain and functional limitations). Because the ALJ justifiably found that

plaintiff's complaints of disabling impairments were not fully credible, his decision to give "little

weight" to the treating physicians' opinions on the ground they relied heavily on plaintiff's self-

reported subjective complaints is substantially supported. *See Sims v. Comm'r of Soc. Sec.*, 406

F. App'x 977, 979-80 (6th Cir. 2011) (finding ALJ properly discounted treating physician's

conclusory about plaintiff's ability to work which was "based largely on plaintiff's subjective

complaints and was not supported by other medical evidence in the record").

14

Finally, the ALJ reasonably discounted the opinions of Drs. Thayapran, Kakaji, Prasad and Provaznik based on the dates the opinions were issued relative to the alleged disability onset date of December 1, 2010 and the date last insured of December 30, 2010. The ALJ discounted the opinions of Drs. Thayapran, Kakaji, and Prasad issued between April 2006 and July 2009, which advised against any bending, lifting over 10 pounds, and prolonged standing, on this ground. (Tr. 20-21). The ALJ found the opinions were of minimal relevance to plaintiff's functionality during the relevant time period because they had been issued one to four years before that time frame. (Tr. 20-21). The ALJ also found that Dr. Provaznik's opinions dated January and April 2013 were too far removed from the period under consideration to be of significant probative value. (Tr. 22). Plaintiff alleges the ALJ erred by failing to provide a good reason as to why the timing of Drs. Prasad and Provaznik's reports was problematic but the timing of Dr. Vickery's report, which was issued 22 months after the date last insured and did not specify the onset date of plaintiff's limitations, was not. Plaintiff notes that Dr. Prasad issued his report 17 months before the date last insured; Dr. Provaznik issued an opinion three months before the date last insured; and Dr. Provaznik issued another opinion 25 months after the date last insured in which he specified that plaintiff's limitations predated the date last insured. (Doc. 11 at 12).

The ALJ did not err by rejecting opinions rendered by the treating physicians on the ground they were not relevant to the time period under consideration. Initially, the ALJ did not discount Dr. Provaznik's September 2010 report based on the timing of the report as plaintiff suggests. The ALJ discounted only Dr. Provaznik's 2013 opinions for this reason. (Tr. 22). Further, although Dr. Vickery did not specify an onset date for plaintiff's impairments and accompanying limitations in his October 2012 evaluation, Dr. Vickery made clear that the

symptoms and limitations he assessed had manifested themselves in the months immediately preceding his report.  Dr. Vickery opined that it was during this time period that the sequelae plaintiff likely suffered as a result of her 1997 head injury, which may have been mild and in the background, had come "to the forefront" as a result of intense recent life stressors.  (Tr. 411). The ALJ reasonably construed Dr. Vickery's report as a statement that plaintiff exhibited little evidence of a disabling impairment prior to December 31, 2010.  (Tr. 19).  As further discussed below, the ALJ specifically addressed why he credited Dr. Vickery's assessment relating to the onset date.  (Tr. 19).  Thus, the ALJ did not err by rejecting the treating physicians' opinions on the ground they were not relevant to the time period under consideration.

The ALJ properly evaluated the treating physicians' opinions in accordance with the regulatory factors and gave "good reasons" for according those opinions "little weight."  The ALJ relied on the October 2012 opinion of one-time examining neuropsychologist Dr. Vickery, which the ALJ assigned "great weight."  (Tr. 19, citing Tr. 409-11).  Dr. Vickery saw plaintiff on referral from Dr. Provaznik to assess her "neuropsychological functioning in the context of recent exacerbation of symptoms from a traumatic brain injury sustained in February of 1997." (Tr. 409).  Plaintiff reported to Dr. Vickery that after her 1997 workplace accident, she had been able to resume work as a technical writer but "more recently" she noticed a "significant increase in her difficulties."  (Tr. 410).  Plaintiff reported she had been experiencing increased depressive and anxiety symptoms and she had recently been taking Paxil more consistently due to the number of psychosocial stressors in her life.  (*Id*.).  She also reported increased headaches, cognitive difficulties, and sleep issues even with the aid of Ambien and Flexeril.  Plaintiff reported that the "past several months [had] been very difficult for her" due to financial stressors since being denied disability benefits, her husband losing his job, her father experiencing a

recurrence of colon cancer for which he was undergoing treatment, her daughter being diagnosed with both kidney and aggressive thyroid cancer which had spread and required aggressive, prolonged treatment, and the recent death of her husband's two dogs. (*Id*.).

Dr. Vickery administered a number of neuropsychological tests. He opined that plaintiff "likely suffered some degree of cognitive sequelae as a result of her head injury in 1997, but these effects may have been mild and 'in the background' until life stressors reached a recent fever pitch, thus bringing her head injury sequelae to the forefront." (Tr. 411). The ALJ credited Dr. Vickery's opinion because the ALJ found his opinion that plaintiff exhibited little evidence of a disabling impairment prior to the date last insured of December 31, 2010, to be within Dr. Vickery's area of expertise; his opinion was supported by medical signs and findings on examination; and his opinion was consistent with other medical evidence of record. (Tr. 19).

Plaintiff alleges that the ALJ's decision to give "great weight" to Dr. Vickery's opinion as to the debilitating impacts of plaintiff's 1997 head injury and their onset date was error on several grounds. (Doc. 11 at 9-13). First, plaintiff asserts that the ALJ has mischaracterized Dr. Vickery's report as supporting a finding that plaintiff's disability does not pre-date the date last insured. (*Id*. at 9, citing Tr. 19). Plaintiff alleges that Dr. Vickery evaluated plaintiff only with regard to her severe impairment of status-post remote traumatic brain injury and did not assess her remaining severe impairments of migraines, degenerative disc disease of the lumbar and cervical spines, insomnia, polyarthralgias, and Raynaud's phenomenon. Second, plaintiff alleges that Dr. Vickery did not discuss either the status of plaintiff's impairments near the date last insured or the severity of her impairments prior to the date they worsened. Third, plaintiff alleges that Dr. Vickery is a one-time examining medical source who lacked a longitudinal perspective of plaintiff's impairments.

17

The record demonstrates that substantial evidence supports the ALJ's decision to give "great weight" to the opinion of Dr. Vickery and to credit his opinion over the opinions of plaintiff's treating physicians. First, as indicated above, the ALJ reasonably construed Dr. Vickery's report as finding that plaintiff exhibited little evidence of a disabling impairment prior to December 31, 2010. (Tr. 19, citing Tr. 409-11- Dr. Vickery opined that plaintiff's head trauma sequelae "may have been fairly mild" and "stayed in the background" until recent psychosocial stressors exacerbated her symptoms). The ALJ justifiably credited Dr. Vickery's opinion on this issue as a matter within the neuropsychologist's area of expertise. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Further, the ALJ reasonably credited Dr. Vickery's opinion that plaintiff did not experience disabling symptoms of head trauma prior to her onset date as consistent with his findings on examination and other medical evidence of record. (Tr. 22). The ALJ cited specific medical signs and findings and other medical evidence that supported Dr. Vickery's opinion as to the mild and non-disabling nature of the sequelae of plaintiff's work-related injuries on or prior to December 31, 2010. (*Id.*, citing Tr. 287- results of 12/2/10 rheumatoid arthritis test were negative; Tr. 352-12/10/10 neurological examination was "relatively normal"; Tr. 380- plaintiff was "neurovascularly intact" on 11/19/10 examination for left knee pain). Substantial evidence supports the ALJ's decision to credit Dr. Vickery's opinion as to the onset date of plaintiff's disabling symptoms.

Second, the ALJ did not err by giving "great weight" to Dr. Vickery's opinion based on the limited scope of Dr. Vickery's evaluation. Dr. Vickery evaluated plaintiff's "neuropsychological functioning in the context of recent exacerbation of symptoms from a

traumatic brain injury sustained in February of 1997." (Tr. 409). The ALJ credited Dr. Vickery's opinion that the "sequelae of [her] injuries were mild and not disabling on or prior to December 31, 2010." (Tr. 22). Although Dr. Vickery limited his assessment to plaintiff's neuropsychological impairments, the ALJ relied on objective evidence showing that Dr. Vickery's opinion was consistent with other medical evidence of record regarding the disability onset date, including normal physical examination and laboratory findings. (Tr. 22, citing Tr. 352, 358, 380). Plaintiff has not pointed to substantial medical evidence that demonstrates the ALJ erred by relying on Dr. Vickery's opinion as to the onset date of her debilitating symptoms.

Finally, the ALJ did not err by relying on Dr. Vickery's report on the ground Dr. Vickery was a one-time examiner who lacked a longitudinal perspective of plaintiff's condition. Under the Social Security regulations, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson*, 402 U.S. at 402). Dr. Vickery is a specialist who administered a number of tests to plaintiff and issued objective findings within his field of expertise based on the results of those tests. For the reasons explained above, the ALJ gave valid reasons for crediting Dr. Vickery's opinion as to the onset date of plaintiff's disability, and Dr. Vickery's opinion constitutes substantial evidence in support of the ALJ's decision.

The record therefore demonstrates that the ALJ did not err by giving "great weight" to the opinion of Dr. Vickery and less weight to the opinions of plaintiff's treating physicians. Substantial evidence supports the ALJ's decision to reject the treating physicians' largely conclusory opinions in light of the lack of supporting and consistent clinical and objective

19

discussed in this opinion. *See Edwards v. Comm'r of Social Security*, -- F. App'x --, No. 15-3546, 2016 WL 231136, at *2, (6th Cir. Jan. 19, 2016) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) (ALJ may properly discount medical sources' conclusory statements)). To the extent plaintiff argues that the ALJ erred because there is consistent opinion evidence in the record which supports a finding of disability, plaintiff's argument is unavailing. There is substantial evidence in the record to support the ALJ's finding that plaintiff was not disabled prior to the date last insured. It is the Commissioner's function to resolve such conflicts in the medical evidence, s*ee Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987), which is precisely what the ALJ did here.

For these reasons, plaintiff's first and second assignments of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be **CLOSED** on the docket of the Court.

Date: 2/2/2016

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TERESA E. KELLY,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-119
Barrett, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).